IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38345-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ROBERT CHARLES POTTS, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Robert Potts challenges his two convictions for assault on his wife, one conviction for unlawfully imprisoning his wife, and one conviction for unlawfully imprisoning his stepdaughter. He argues that the trial court erred when excluding testimony from neighbors as to the reputation of the wife, Megan Francis, for dishonesty. He also challenges conviction for unlawfully imprisoning his stepdaughter on sufficiency of evidence. Because Potts failed to identify, during his offer of proof, a recognized community wherein neighbors knew of the reputation of Francis, we reject his evidentiary assignment of error. Because the jury could conclude that Potts acted beyond reasonable discipline when restraining his stepdaughter, we reject his sufficiency of evidence assignment of error. We affirm all four convictions.

FACTS

This prosecution arises from Robert Potts' interaction, at home, with his wife and stepdaughter. Potts and Megan Francis married one another. Francis had a daughter, Jane, a pseudonym, from a previous marriage. Potts raised the daughter, from Jane's tender years, as if his own child. Potts occasionally punished Jane with the permission of Francis.

One day at home, Megan Francis and Jane loudly argued over chores. The argument awoke Potts, who reposed in the basement. Potts scrambled upstairs and dragged Francis downstairs by her wrist. On reaching the basement with Francis in tow, Potts screamed at Francis for awakening him, pushed her onto a bed, and choked her. As a result of the choking, Francis encountered dizziness and difficulty in talking. Potts next insisted that Francis remain in the basement, and a frightened Francis complied. Potts then grabbed Francis, bent her over his knee, and spanked Francis with a belt. The pain from the belt lasted three days.

After attending to Megan Francis, Robert Potts summoned Jane to the basement. After walking downstairs, Jane saw her mother crying in a corner. Jane had seen Potts physically harm Francis on other occasions. Potts threatened to spank Jane with a belt. A fearful Jane desired to leave the basement, but Potts ordered her to remain.

PROCEDURE

The State of Washington alleged that Robert Potts committed three crimes against

Megan Francis: unlawful imprisonment, third degree assault, and second degree assault.

The State also charged Potts with the unlawful imprisonment of Jane.

Robert Potts filed an unusual motion to dismiss the charges on the basis that thirty

witnesses would testify on his behalf.  In support of his motion, Potts attached three

witness letters.  One letter, authored by Robert Neher, declared:

> To whom it may concern I have lived next door to Robert [Potts] for
> approx 15 years.  During this time he has always been a very well
> a[d]justed individual, He is a kind law abiding man that *never has a[n]y*
> *issues until his wife gets intoxicated, the[n] she goes on a rampage and*
> *never seems to cool off until stuff gets broke or a lot of yelling occurs*.  We
> have also known Megan [Francis] since she has been with Robert and she
> has always drank alcohol in excess I believe to the point of being
> beligerent.
> Rob does not drink and is disabled from the city of Spokane he helps
> anyone he can around the neighborhood when possible.  He Is differently
> [definitely] not being treated fair in this situation at all I remember the night
> in question and I remember hearing [Jane] and Mother Meg arguing when
> Robert had also heard the altercation going on, HE went inside and told
> them to both go down stairs now, I know this because when Rob yells I
> believe the whole neighbor hood can hear, he has a very loud voice.  But he
> was only inside for about 10 to 15 minutes then he came out and returned to
> work because they are trying to sell the house.  There was no screaming or
> yelling after that, that would ind[i]cate that some type of physical fight had
> happened both [Jane] and Megan returned upstairs and continued to make
> food and watch tv I know cause my bedroom sits right next to their kitchen.
> [P]eople have tried to say [R]ob uses drugs and he does the ones the doctor
> has him on.  He has really bad back as[]well as super bad neck.  But he is
> not a recreational drug user.  MY entire family was home and that is the
> way they remember it as well.
> *When ever there has been some physical altercation going on it has*

3

> *been because Megan has been drinking* hard liquor I have seen Rob run out
> of the house and literally climb the back fence and run around to the front
> to get in his car and leave I have seen that once but other have occurred.
> We have security cams that cover all the area our and theirs and at no time
> did Rob come to the house for any reason we rewound the drive and there
> was never once when Rob had come back to the house.

Clerk's Papers (CP) at 23 (emphasis added).

Often a party believes a friendly witness supports his case when the testimony instead detracts from success. Robert Neher's letter suggested that Robert Potts became frustrated with his wife when she got intoxicated and he responded by yelling, physically fighting, and breaking objects. Neher told a differing story from that of Robert Potts as to events the day of the criminal charges. Neher claimed that Potts was outside of the home when Megan Francis and Jane vociferously argued. To the contrary, Potts stated that he then slept downstairs. Regardless, Robert Neher omitted, from his letter, any reference to either Potts' or Francis' reputation for honesty.

Erin Neher penned a letter that Robert Potts filed with his motion to dismiss. The letter declared:

> To whom this may concern;
> My name is Erin Neher, and my family and I have been Robert Pott's neighbor for 15 years. From the very get go he has shown me and my family nothing but love, support and just a very nice guy. I've known Megan Francis for 9 years and from the very beginning with her it started out lying about her daughter [Jane] wasn't her's but her sister's. Nothing but lies on top of lies, and brings in drama. We've helped her with her family and baby daddy drama issues. My family has never felt easy or comfortable around her or her child. She's just all over the place and body movement constantly, and just not talking very much sense, so we tried

4

avoiding Megan and [Jane] as much as possible. I've had numerous interactions with Megan and [Jane] a couple months before this all happened? Megan nor [Jane] showed any signs of anything happening in their home or marriage. I had a interaction with both Megan and [Jane] days before the cops were called and we had a face to face interaction at my fence, I could smell the wine from her breath, her eye's were glassed, she was swaying back and forth at one point grabbing onto fence to get her balance, mumbled speech. She [Megan?] was mumbling her normal God loving talk not really making any sense, [Jane] behind her just agreeing with everything her mom is saying. Neither one said anything was going on with them, no bruises, marks, cuts nothing. And in all honesty I believe she is a Meth user, by her constant body movements, twitching, picked at skin, looking wide awake. I have said this about her to my family for years. They both come and go as they like, so there was no "imprisonment going on. She is more of a friend to [Jane], than a mom. She wants [Jane] to like her and will do whatever for her to be friends with her instead of being [Jane's] mom. They both knew we are that family you can safely come to if you need help, no judgments we're there for you, until you break that bond like she has with all these FALSE allegations. We called her out on them not coming to us sooner and we could of dealt with whatever the situation where cops didn't need to be called. She's just sitting over there doing Rob dirty, which isn't very "God like" actions, the man that took her and her child in and has done nothing but support them both, COMPLETELY 100% for 10 years. Never once had a job or brought her own money to the table. And yet HE is forced to surrender his firearms and leave his home, a home that he has had/owned for at least 30 years, for what? LIES! She has had so many different people coming and going all the time. One day a guy showed up in a white/black SUV took in a tool bag. We heard from our bathroom window power tools and hammering, which we believe she broke into his safe and stole silver he's had since before she was ever in the picture. We think she is selling HIS belongings while he has to keep away. I don't think that's right, she shouldn't be able to do that. She has no income, but yet she's coming home with groceries, gas for car, wine. We have been keeping an eye on who comes and goes. We have camera footage of everything, even back at my interaction with Megan right before they stormed in and arrested Rob. We just need to figure password. Cops showing up almost weekly, and for what? Who knows, no clue. Just wasting their time. Slandering his name to HIS neighbor's. Then the whole second arrest for a no contact violation. But

5

that came after the water was shut off, so a tantrum is thrown and more lies being told.  So now Megan and [Jane] are staying in a house with no running water, I feel as a parent that would be bad especially with a minor in home.  So this is my and my families plea to please let him go HOME, make her leave.  She has no mean's of income, its not fair for him to have to pay bills for a home he has owned before ever knowing her, and not be able to sleep in his own bed.  She needs to leave cause obviously she doesn't want to reconcile or talk things out.  She really needs to leave because she is selling all of his possessions, and she shouldn't be able to do that, none of this.  My family and I will do anything, videos, pics etc. to help a friend out, more like family.  We love and miss you Rob.  Feel so sorry and angry your having to go through this when you do nothing but help those that need help.  You're a good person.  We couldn't of asked for a better neighbor than you, so please let him come home.  Don't believe her lies, make sure to really look into what she's saying.  Don't forget we have video of EVERYTHING, we would just need to figure password out and you got it all, her coming/going freely, no sign of abuse, interaction leading up to arrest, the arrest, EVERYTHING to get Rob home.  Our family of 6 Erin Neher, Richard Neher, Aiyla Neher, Naveah Neher, Robert Neher, Linda Neher will fight and ALWAYS back Rob 100%.

CP at 26-29 (punctuation and grammar from original).  Erin Neher's letter accused Megan Francis of periodically lying, but Neher did not express any knowledge of Francis' reputation in the community for truthfulness.

We assume the superior court denied the motion to dismiss, although the clerk's papers sent to the court do not include an order denying the motion.  Robert Potts later requested that the trial court permit Robert and Erin Neher and perhaps others to testify to Megan Francis' reputation for untruthfulness.  In response, the trial court entertained a proffer of testimony from trial defense counsel in order to lay a foundation for reputation testimony.  Potts' attorney intoned:

> MR. PARTOVI [defense counsel]: Well, there's five people, maybe six that live in [the Nehers'] house. They've got neighbors across the street and at the end of the block that know Megan and have known her since she moved in, whenever that was. Mr. Potts has been there for 32 years. He fixes everybody's stuff when it breaks.
>
> So they have all met [Jane]—I'm sorry—Megan and, you know, she's developed a reputation for dishonesty because of all the lies she's told them all, which I will not ask about.

Report of Proceedings (RP) (May 26, 2021) at 478.

The State objected to Robert Potts introducing the proffered evidence. The State, based on its review of Robert and Erin Neher's letters, characterized the prospective testimony as being the witnesses' opinion of the honesty of Megan Francis, not knowledge of Francis' reputation for untruthfulness. The State added that the Nehers were not neutral witnesses. The State conflated biased witnesses with a nonneutral community, a requirement for admissibility of testimony.

The astute trial court asked defense counsel to identify the asserted neighborhood. Defense counsel answered:

> It's, also [in addition to the Nehers], people across the street directly, across the street next door, and I think there's a house on this side—they would have to tell you. I would show you a Google maps overhead view, but I don't want you to take my laptop.
>
> There's a lot of houses there. It's Hillyard, and these are small houses and pretty densely populated, and people hang out in the front yard, including Megan Francis and [Jane].

RP (May 26, 2021) at 482. Defense counsel added that "a bunch of homes that live together is like the most foundational definition of community. It's the neighborhood."

RP (May 26, 2021) at 482. The court asked counsel for a decision that held a grouping of five houses constituted a community for purposes of reputation testimony. Counsel promised to look for a decision. Defense counsel added that Robert Potts' repairs in neighbors' homes rendered the neighborhood a community. He added that the neighbors across the street became upset because Potts' incarceration awaiting trial prevented his assistance. Defense counsel never later cited a case on point.

The trial court denied Robert Potts' request to admit the reputation testimony in part because Potts only identified a limited group of persons to testify to Megan Francis' reputation for lying. The trial court added that the witness needs to be neutral if the witness is part of the relevant community.

Defense counsel responded to the superior court's ruling on reputation evidence:

> MR. PARTOVI: I just want the record to be clear that you're not giving me an opportunity to lay the foundation. You're saying it's not there without hearing the witnesses. Therefore, you can't admit it.

RP (May 26, 2021) at 488. Counsel also wondered how any witness within the community could be neutral because of Megan Francis being a pathological liar. Potts never proposed that he submit an offer of proof through witnesses testifying outside the presence of the jurors for the court to render a more informed decision.

During trial, Megan Francis testified to the events of the charging date including the assault on her. Francis also testified to a history of domestic violence at the hands of Robert Potts.

Neighbor Robert Neher testified on behalf of Robert Potts. Robert Neher averred that nearly every time he interacted with Megan Francis, Francis was impaired by alcohol. Robert Neher never saw bruises or other injuries on Francis. Erin Neher avowed that Francis abused alcohol and twitched like a methamphetamine addict.

The jury instructions defined the crime of unlawful imprisonment:

> A person commits the crime of unlawful imprisonment when he or she knowingly restrains the movements of another person in a manner that substantially interferes with the other person's liberty, if the restraint is without legal authority and without the other person's consent.

CP at 167. Another instruction informed that "[r]estraint is 'without consent' if it is accomplished by physical force, intimidation, or deception." CP at 169. In order to convict Robert Potts of the unlawful imprisonment of Jane, the instructions required the jury to find that beyond a reasonable doubt:

> (1) That on or about June 21, 2020, the defendant knowingly restrained the movements of [Jane] in a manner that substantially interfered with her liberty;
> (2) That such restraint was without [Jane's] consent;
> (3) That the defendant knew that such restraint was without [Jane's] consent;
> (4) That such restraint was without legal authority; and
> (5) That any of these acts occurred in the State of Washington.

CP at 180.

In closing argument, Robert Potts' attorney argued that Potts' confinement of Jane to the basement was lawful:

9

Then, you know, just in terms of argument, I mean, one of the elements of unlawful imprisonment is without legal authority. Let me tell you I restrained my six year old daughter often, too often. It's called go to your room, and she's not happy about it. Does she go to her room? Yeah. Does the conflict with her brother end at that moment or her mother or whatever? Yeah. She sits there for however long dad thinks she needs to sit there. Then we have a talk. Then everything is fine. I'm so lucky it works out perfect.

Is it unlawful imprisonment? By these standards, it is. It's a little simplified to be honest. She's younger, whatever, but Mr. Potts told you what happened. They were having a discussion. He told her to come downstairs for the purpose of having a discussion. I would submit that's lawful authority. He's her dad.

RP (May 27, 2021) at 729.

The jury convicted Robert Potts of all four charges.

LAW AND ANALYSIS

Robert Potts assigns error to the trial court's exclusion of testimony relating to Megan Francis' reputation for untruthfulness amongst her neighbors. Potts also argues insufficient evidence supported his conviction for unlawful imprisonment of Jane. Since his first assignment attacks all convictions, we address reputation testimony first.

Reputation for Truthfulness Evidence

Robert Potts argues that the trial court erred by excluding testimony about Megan Francis' reputation for untruthfulness amongst her neighbors. ER 608(a) controls evidence about a witness's reputation for truthfulness, which we assume also extends to a victim who becomes a witness. This rule declares, in relevant part:

10

> Reputation Evidence of Character. The credibility of a witness may be attacked or supported by evidence in the form of reputation, but subject to the limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness.

(Boldface omitted.) ER 405(a) controls the methods for proving a witness's character.

The rule declares:

> Reputation. In all cases in which evidence of character or a trait of character of a person is admissible, proof *may be* made by testimony as to reputation. On cross examination, inquiry is allowable into relevant specific instances of conduct.

(Emphasis added) (boldface omitted). Although the rule does not state that inquiry into a person's character *shall be* by testimony to reputation, Washington follows the traditional common law rule that proof of character is limited to testimony concerning reputation. 5D KARL B. TEGLAND & ELIZABETH A. TURNER, WASHINGTON PRACTICE: COURTROOM HANDBOOK ON WASHINGTON EVIDENCE ER 405 author's cmt. 405:1 (2022 ed.). One cannot express a personal opinion as to a witness's veracity. *State v. Woodard*, 26 Wn. App. 735, 738, 617 P.2d 1039 (1980).

A party seeking to admit evidence bears the burden of establishing a foundation for that evidence. *State v. Land*, 121 Wn.2d 494, 500, 851 P.2d 678 (1993). According to *State v. Kelly*, 102 Wn.2d 188, 194, 685 P.2d 564 (1984), the method of proving reputation, since 1919, has been governed by this procedure:

> The orderly and proper way to put in evidence of this sort, after the witness has testified to acquaintanceship with the defendant not too remote in point of time, is to have the witness answer No or Yes, as the fact is, to

11

the question, if he knows what the general reputation of the defendant is, in the community in which he resides, for the particular trait of character (naming it) that is relevant to and involved in the crime with which the defendant is charged. If the witness answer No, that ends the inquiry. If he answer Yes, then the next and final question should be, What is it, good or bad?

*State v. Argentieri*, 105 Wash. 7, 10, 177 P. 690 (1919).

One Washington case stands for the proposition that, in order to offer reputation testimony, a witness must lay a foundation establishing that he or she bases the subject's reputation on perceptions in the community. *State v. Thach*, 126 Wn. App. 297, 315, 106 P.3d 782 (2005), *overruled on other grounds by State v. Case*, 13 Wn. App. 2d 657, 466 P.3d 799 (2020). A party seeking to admit reputation evidence bears the burden to show that the purported community is both neutral and general. *State v. Gregory*, 158 Wn.2d 759, 805, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R., Jr.*, 181 Wn.2d 757, 336 P.3d 1134 (2014); *State v. Land*, 121 Wn.2d 494, 500 (1993). Relevant factors "include the frequency of contact between members of the community, the amount of time a person is known in the community, the role a person plays in the community, and the number of people in the community." *State v. Land*, 121 Wn.2d 494, 500 (1993). A trial court exercises discretion to determine whether the foundation for a valid community has been established, abusing discretion when the determination is manifestly unreasonable or based on untenable grounds or reasons. *State v. Land*, 121 Wn.2d 494, 500 (1993).

Reputation among a limited group of persons may not accurately reflect the witness's general character for truthfulness. 5D KARL B. TEGLAND & ELIZABETH A. TURNER, WASHINGTON PRACTICE: COURTROOM HANDBOOK ON WASHINGTON EVIDENCE ER 405 author's cmt. 405:2 (2022 ed.). Any community comprised of two individuals is too small to constitute a community for purposes of ER 608. *State v. Gregory*, 158 Wn.2d 759, 805 (2006).

We apply ER 608 in light of Robert Potts' contentions in the context of ER 103(a)(2). The latter evidence rule declares:

> (a) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
> . . . .
> (2) *Offer of Proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

(Boldface omitted.)

An offer of proof serves three purposes: it informs the court of the legal theory under which the offered evidence is admissible; it informs the judge of the specific nature of the offered evidence so that the court can assess its admissibility; and it creates a record adequate for review. *State v. Ray*, 116 Wn.2d 531, 538, 806 P.2d 1220 (1991), *abrogated on other grounds by State v. Crossguns*, 199 Wn.2d 282, 505 P.3d 529 (2022); *Mad River Orchard Co. v. Krack Corp.*, 89 Wn.2d 535, 537, 573 P.2d 796 (1978). The offer of proof allows the trial court to properly exercise its discretion when

13

reviewing, valuating, and, if necessary, revising its rulings. *Cameron v. Boone*, 62 Wn.2d 420, 425, 383 P.2d 277 (1963). The party offering the evidence must specify what he offers in proof and the reason why he deems the offer admissible over the objections of his opponent. *State v. Ray*, 116 Wn.2d 531, 539 (1991).

We agree with the State that Robert Potts failed to supply the trial court with a sufficient offer of proof. He only mentioned the Nehers and two other neighbors as possible witnesses. He never identified those other neighbors. Potts never circumscribed a community, explained how Megan Francis gained a reputation in the community, or expounded on how proposed witnesses gained knowledge of the reputation. Potts never mentioned how long the witnesses had lived in the community and how frequently they interacted with others in the community.

Whether a party established a proper foundation for reputation testimony lies within the trial court's discretion. *State v. Gregory*, 158 Wn.2d 759, 804-05 (2006). We conclude the trial court did not abuse its discretion when ruling that Robert Potts failed to identify a general and neutral community from which Megan Francis' reputation could be drawn.

We agree with Robert Potts that the community, not the witness, must be neutral. Still the principal home selected for testimony, the Neher family, was biased in Potts' favor and we do not know to the extent other possible witnesses could establish a neutral

community.  The letters did not disclose any familiarity with Francis' reputation in the

community.

Robert Potts claims the exclusion of reputation evidence violated his constitutional

right to present a defense.  A defendant holds a constitutional right to present evidence in

support of his defense.  *State v. Franklin*, 180 Wn.2d 371, 378, 325 P.3d 159 (2014).  But

the right is limited, and a defendant has no right to offer evidence that is otherwise

inadmissible under standard rules of evidence.  *Taylor v. Illinois*, 484 U.S. 400, 410, 108

S. Ct. 646, 98 L. Ed. 2d 798 (1988).  Established procedural rules may protect the

fairness and reliability of evidence.  *Chambers v. Mississippi*, 410 U.S. 284, 302, 93

S. Ct. 1038, 35 L. Ed. 2d 297 (1973).  The exclusion of defense evidence under a state

rule rarely violates the constitutional protection.  *Nevada v. Jackson*, 569 U.S. 505, 509,

133 S. Ct. 1990, 186 L. Ed. 2d 62 (2013).  We conclude that the trial court's exclusion of

the unreliable reputation testimony under Washington's Rules of Evidence did not

prejudice the trial's truth-finding process and did not violate a constitutional right to

present a defense.

Unlawful Imprisonment

Robert Potts argues that insufficient evidence supported his conviction for false

imprisonment of Jane particularly since he directed Jane to remain in the basement for a

short duration as part of his obligation and prerogative to discipline the girl.  Sufficient

evidence supports a criminal conviction when any rational finder of fact could have

15

found the essential elements of the crime established beyond a reasonable doubt when viewing the evidence in the light most favorable to the prosecution. *State v. Dillon*, 12 Wn. App. 2d 133, 140, 456 P.3d 1199 (2020). While direct and circumstantial evidence are equally reliable in determining the sufficiency of the evidence, any inferences based on circumstantial evidence must be reasonable and cannot be based on speculation. *State v. Dillon*, 12 Wn. App. 2d 133, 140 (2020).

For the first time on appeal, Robert Potts cites to a statutory defense to argue his restriction of Jane was within his lawful power as a stepfather to discipline Jane. Under the statute, the physical discipline of a child is lawful when it is reasonable and moderate and is inflicted by a parent or guardian for purposes of restraining or correcting the child. RCW 9A.16.100. Potts never presented RCW 9A.16.100 as a defense at trial and never requested a jury instruction referencing the statute. Appellate courts will not consider issues raised for the first time on appeal. RAP 2.5(a); *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007).

"A person is guilty of unlawful imprisonment if he or she knowingly restrains another person." RCW 9A.40.040(1). RCW 9A.40.010(6) defines "restrains" as used in RCW 9A.40.040 as:

> "Restrain" means to restrict a person's movements without consent and without legal authority in a manner which interferes substantially with his or her liberty. Restraint is "without consent" if it is accomplished by (a) physical force, intimidation, or deception, or (b) any means including acquiescence of the victim, if he or she is a child less than sixteen years old

16

or an incompetent person and if the parent, guardian, or other person or institution having lawful control or custody of him or her has not acquiesced.

The State advanced prong (a), which requires force, intimidation, or deception.

A substantial interference with one's liberty entails a "real" or "material" interference as contrasted with a petty annoyance, a slight inconvenience, or an imaginary conflict. *State v. Robinson*, 20 Wn. App. 882, 884, 582 P.2d 580 (1978), *aff'd*, 92 Wn.2d 357, 597 P.2d 892 (1979). Unlawful imprisonment constitutes a lesser offense than kidnapping. *State v. Robinson*, 20 Wn. App. 882, 885 (1979).

Even considering the legal protection of a parent to subject their child to reasonable and moderate physical discipline, RCW 9A.16.100 does not universally foreclose a finding of unlawful imprisonment against a parent. Parents can be guilty of unlawful imprisonment of their own children in circumstances when the restrictions on the children's movements, viewed objectively, are excessive, immoderate, or unreasonable. *State v. Kinchen*, 92 Wn. App. 442, 444, 963 P.2d 928 (1998). Key to both the statutory defense and the common law rule are the requirements that a parent act reasonably and moderately when disciplining a child.

The evidence showed that Potts intimidated Jane by yelling at her and threatening her with a belt. The jury could have reasonably concluded that this conduct constituted unreasonable intimidation.

Robert Potts also argues that a history of domestic violence by a parent cannot alone show that a parent unlawfully intimidated a child under the unlawful imprisonment statute. Potts may be correct that such a history does not show intimidation, but the history may be considered with Potts' other actions. The Supreme Court held in *State v. Ashley*, 186 Wn.2d 32, 42, 375 P.3d 673 (2016), that a history of domestic abuse is highly material and relevant to a determination of restraint by intimidation. In light of Potts' history of abusing her mother, Jane, based on fear, refused to leave the basement when Potts ordered her to stay.

## CONCLUSION

We affirm Robert Potts' convictions for assault and unlawful imprisonment.

The panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Pennell, J.

_____
Staab, J.

18